UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN WALSH,<br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN, *Acting Commissioner of Social Security, U.S.A.*,<br>    Defendant. | No. 3:13-cv-00687 (JAM) |

**RULING ON CROSS MOTIONS TO REMAND AND AFFIRM DECISION
OF THE COMMISSIONER OF SOCIAL SECURITY**

Plaintiff John Edwards Walsh claims that he is disabled and cannot work as a result of depressive disorder with panic, dependent personality disorder, and polysubstance abuse. He has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security, who denied plaintiff's claim for supplemental security income and disability insurance benefits. The Commissioner concluded that although plaintiff suffered from severe impairments and could not work in his previous jobs, he retained sufficient residual functional capacity to secure other types of employment. Although I do not agree with most of plaintiff's arguments, I am convinced that a remand is appropriate for additional consideration of plaintiff's dependent personality disorder and its effect on both the ALJ's evaluation of plaintiff's residual functional capacity and the ALJ's evaluation of plaintiff's ability to secure employment. For the reasons that follow, I will grant plaintiff's motion to reverse or remand the decision of the Commissioner (Doc. #17), and deny defendant's motion to affirm the decision of the Commissioner (Doc. #19), and I will remand the case for prompt reconsideration by the ALJ.

**BACKGROUND**

The Court refers to the transcripts provided by the Commissioner. *See* Doc. #8-3.

Plaintiff is a 48 year old man who lives in Hartford, Connecticut. He graduated from high school and college, and worked as a cruise ship drummer for about ten years. Starting in 2003, he began working part-time at various temp agencies and bicycle shops. By 2006, he had begun to experience a worsening depression and found it hard to maintain a job. He has held different short-term jobs, but the work was sporadic. He relied on his elderly father to support him financially, even though his father was on a limited income himself. Plaintiff has been receiving assistance from social service agencies since 2009 with housing, bills, and making it to appointments. He was on state food assistance as well. At the time of his disability application, he was 41 years old.

Plaintiff's medical history shows an increasingly troubled mental health status. He first sought mental health treatment in March 2009. He was diagnosed with depression and panic disorder. He underwent an initial assessment at the Capitol Region Mental Health Center (CRMHC) and was referred to Hartford Behavioral Health (HBH) for further treatment. He was supposed to go to HBH for appointments once per week, but often missed appointments. He was prescribed various psychiatric drugs to help him cope with his illnesses, which he usually took as prescribed unless he was running low on medication and without insurance to get more. When this happened, he would ration his medicine and take smaller doses.

Plaintiff received treatment at HBH from May 2009 until August 2011. In May 2011, a clinician at HBH diagnosed plaintiff with Axis II dependent personality disorder. In August 2011 plaintiff transferred his care to Community Health Services. He also received emergency treatment twice from St. Francis Hospital in Hartford for an acute mental health condition over these two years, and he once went to Hartford Hospital for back pain, where he was diagnosed with sciatica and lumbar strain. He was never admitted as an inpatient to a hospital during this

time. In September 2011, he was admitted to an intensive outpatient program at the Institute of Living (IOL). In December 2011, he was admitted to the IOL as an inpatient for one week.

In July 2009, plaintiff filed an application for disability and disability insurance benefits under Title II of the Social Security Act for a period beginning in May 2008. The application was denied initially in November 2009, and on reconsideration in August 2010. In denying the initial application, a non-examining state medical consultant reviewed the treatment records from HBH, CRMH, and St. Francis hospital for disability and found that the plaintiff's impairments were not severe enough to warrant disability benefits.

After a hearing in August 2011, Administrative Law Judge (ALJ) Kim K. Griswold found that plaintiff was not disabled as defined by the Social Security Administration (SSA). The ALJ issued the decision in October 2011. Plaintiff requested Appeals Council review in November 2012, which was subsequently denied in April 2013. He then filed this federal action, seeking review of the Commissioner's decision and asking that the Court reverse the Commissioner's decision or remand the case for rehearing. *See* Doc. #13.

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). This Court must uphold the Commissioner's decision if it is supported by substantial evidence even if this Court might have ruled differently. *See Eastman v. Barnhart,* 241 F. Supp.

2d 160, 168 (D. Conn. 2003).

Plaintiff advances five claims of error: (1) that the ALJ erred in not completing the record adequately, (2) that the ALJ erred in failing to advise him of his right to counsel, (3) that the ALJ erred in assessing the severity of his mental health impairments, (4) that the ALJ erred in calculating his residual functional capacity (RFC), and (5) that the ALJ erred in not properly canvassing the vocational expert. The Commissioner has cross-moved to affirm the SSA's final decision. *See* Doc. #19.

*1. Alleged Failure to Develop Record*

Plaintiff contends that the ALJ did not adequately develop a record. "The ALJ, unlike a judge in a trial, must herself affirmatively develop the record" in light of "the essentially non-adversarial nature of a benefits proceeding." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1512(d)-(f) (1995), and exists even when, as here, the claimant is represented by counsel. *See Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999); *see also Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 537 (S.D.N.Y. 2015). The ALJ, however, has a duty to develop the record only if the evidence before her is "inadequate . . . to determine whether [the plaintiff is] disabled." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

There is no question that as of the date of the ALJ's hearing there were medical records and documents missing from the plaintiff's file. A significant portion of the beginning of the hearing consisted of the ALJ reprimanding plaintiff's attorney for not producing "a lick of medical evidence" since being appointed in 2010. Doc. #8-3 at 57. The ALJ, however, appropriately took steps to complete the record. *See, e.g., id.* at 62 (medical release on the

record), at 67-69 (subpoenaed provider records). She then found that there was enough information to make a determination regarding plaintiff's disability, and she made her decision.

Plaintiff contends that the record was incomplete because the ALJ did not subpoena records from Community Health Services. But there was no reason to subpoena records from Community Health Services because such records would not have provided useful evidence for the ALJ's determination, as plaintiff had only switched providers the day before the hearing and had not yet completed the intake process. *See* Doc. #8-3 at 68.

Plaintiff also argues that the Appeals Council should have considered certain information in making its decision that it did not consider, including post-hearing evidence from IOL. It is true that claimants are allowed to submit additional, post-hearing evidence to the Appeals Council that is "new and material and that . . . relate[s] to the period on or before the ALJ's decision." *Perez v. Chater*, 77 F.3d at 45. The Appeals Council must, by regulation, "review the new evidence" and treat it "as part of the administrative record." *Ibid.*

Further, the Social Security Act provides that a court may order the Secretary to consider additional evidence upon remand, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir. 1991); *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 308 (S.D.N.Y. 2014). Materiality requires "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Jones*, 949 F.2d at 60.

Here, plaintiff was admitted to the outpatient intensive treatment at IOL in September 2011 and later was admitted for inpatient treatment in December 2011. Both of these treatments occurred after the hearing. These records were submitted to the Appeals Council, and are part of

the record before the Court, and do not give any information as to plaintiff's condition prior to the hearing date of August 10, 2011. *See* Doc. #8-10 at 113-24. Therefore, the Appeals Council was not required to consider the IOL treatment records.

### *2. Alleged Failure to Advise of Right to Representation*

Plaintiff claims that the ALJ failed to advise him of his right to counsel and should have canvassed him about his interest in obtaining representation. Claimants in a social security disability hearing do not have a constitutional right to counsel, but do have the statutory and regulatory right to be represented by retained counsel if they so choose. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 406 and 20 C.F.R. § 404.1705).

Because there is no dispute that the plaintiff here was represented by counsel, the ALJ was not required to canvass the plaintiff regarding his statutory and regulatory right to representation. And although plaintiff's counsel was reprimanded on the record for his poor performance in not obtaining the medical records he should have prior to the hearing, that does not create a right to relief for ineffective assistance of counsel absent—at the least—a showing of ultimate prejudice and error in the outcome of the proceedings.

\* \* \*

Plaintiff's remaining claims attack specific findings by the ALJ. Before addressing these claims, it is necessary to review the legal framework that governs the evaluation of a claim for disability benefits and to describe the findings set forth in the ALJ's decision. To qualify for disability insurance benefits, a claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only

unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)).

A five-step, sequential evaluation process is used to determine whether a claimant is disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Social Security Administration's listing of impairments; (4) whether—based on a "residual functional capacity" assessment—the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing Social Security regulations). The claimant bears the burden of proving her case at steps one through four, while the burden shifts at step five to the Commissioner to demonstrate that there is other work that the claimant can perform. *Ibid.*

Here, the ALJ found at step one that plaintiff had not engaged in any substantial gainful activity since May 2, 2008. At step two, the ALJ determined that plaintiff's depressive disorder (without psychosis) with panic, dependent personality disorder, and polysubstance abuse were severe impairments, because they created "limitations in his ability to understand, remember, and carry out complex instructions" which "significantly interfere with [his] ability to perform basic work activities." Doc. #8-3 at 40.

At the third step, the ALJ declined to conclude that plaintiff was *per se* disabled, because

plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." *Id.* at 41. Specifically, the ALJ compared plaintiff's impairments to three of the listed impairments: affective disorders (Listings § 12.04); personality disorders (§ 12.08); and substance addition disorders (§ 12.09). With certain limited exceptions for the affective disorders impairment under §12.04—referred to as "paragraph C" criteria—each of these listed impairments require at least two of the following "paragraph B" factors to be met:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

*See* §§ 12.04, 12.08, 12.09.

The ALJ concluded that none of the "paragraph C" criteria applied in plaintiff's case, as there were no periods of decompensation at all, let alone extended periods.[1] Doc. #8-3 at 41. In addition, she found that plaintiff had mild limitations along the first two "paragraph B" categories, relying on plaintiff's testimony at the hearing and his reports of Activities of Daily Living (ADL). The ALJ further found "moderate difficulties" with concentration, persistence, and pace. Doc. #8-9 at 2. The ALJ found "no marked impairments of attention or concentration" in the record. Doc. #8-3 at 40. Further, the ALJ found that plaintiff's record showed no inpatient treatment for a mental impairment. *Id.* at 41.

---

[1] The Social Security Administration defines decompensation as the "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning" in the other categories of functioning (daily activities, social life, or concentration). Repeated episodes of decompensation, each of an extended duration means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or an equivalent hardship on a different time frame. 20 C.F.R. Part 404, Subpart P, Appendix 1.

Proceeding to step four, the ALJ was required next to identify plaintiff's "residual functional capacity" (RFC), which is "the most the claimant can still do in a work setting despite the limitations imposed by h[er] impairments." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*). This is a two-step process that requires the ALJ to consider if there is "an impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms." *Vasquez v. Barnhart*, 2004 WL 725322, at *10 (E.D.N.Y. 2004). Then, "once an underlying physical or mental impairment [ ] that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* Part of this evaluation includes making "a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Robinson v. Colvin*, 2015 WL 4759068, at *3 (D. Conn. 2015).

The ALJ concluded that plaintiff's RFC enabled him to "perform a full range of work at all exertional levels" but with some "non-exertional limitations." Doc. #8-3 at 41. The ALJ found that plaintiff could "understand, remember, and carry out simple instructions throughout an ordinary workday and workweek with normal breaks on a sustained basis," "occasionally understand, remember, and carry out moderately complex instructions," and "adapt to simple changes in the ordinary work setting." *Id.* at 41-42.

In addition, the ALJ determined that plaintiff was not credible as to the severity of his symptoms and limitations. In so finding, she noted that plaintiff alleged back pain as part of his disability, but produced "no evidence in the record of any medically determinable back impairment." *Id*. at 43. The ALJ also found that plaintiff had not submitted any medical records

for the beginning period of his claimed disability, and had given inconsistent statements regarding substance use, both of which negatively impacted his credibility. She did consider his work history as a positive factor towards his credibility. *See ibid.*

At step five, the ALJ considered plaintiff's age, education, work experience, and RFC to conclude that plaintiff is capable of performing jobs that exist in significant numbers in the national economy, and therefore concluded that plaintiff is not disabled as defined by the SSA. *See* § 404.1520. The ALJ first found that the plaintiff was unable to perform any past relevant work, including his past skilled and semi-skilled work as an office clerk, bicycle assembler/repairer, musician, or teacher. *See* Doc. #8-3 at 45. On the basis of testimony from a vocational expert, the ALJ concluded that plaintiff could perform other suitable jobs, including work as a receptionist, general office clerk, or retail sales person. *See id.* at 46.

\* \* \*

Plaintiff challenges each of the ALJ's determinations at steps three, four, and five of the determination process. Each of these challenges is addressed in turn.

*Alleged Error of ALJ as to Step Three (Severity Assessment)*

Plaintiff claims that the ALJ erred in finding that he did not meet the "paragraph B" requirements to be considered *per se* disabled. As noted above, the ALJ relied on the plaintiff's ADLs and the March 2009 report from the CRMHC in making the determinations about the first three "paragraph B" requirements (marked restriction in daily activities, marked difficulty in social interactions, and marked difficulty with concentration and pace). In the Court's review of the record, including the reports of treating physicians, the plaintiff's testimony at the hearing, and the plaintiff's reports of daily living, the Court finds that the ALJ had substantial evidence that plaintiff did not satisfy at least two of the "paragraph B" criteria. Therefore, the Court

upholds the ALJ's determination that the plaintiff was not *per se* disabled with a listed severe impairment.

The ALJ found that plaintiff had only mild restriction in activities of daily living, finding credible plaintiff's reports that he lived alone, had a driver's license and would drive, and that he could bike, use public transit, shop for groceries, do laundry, clean, cook, and use a computer. Plaintiff is correct that there is evidence elsewhere in the record to suggest that he did have at least moderate restriction of daily activities, in that treatment providers noted he had poor personal hygiene and required help in multiple areas of daily living activities. *See* Doc. #8-7 at 91-93, Doc. #8-10 at 14. The treatment provider who diagnosed plaintiff with dependent personality disorder indicated that this impairment caused him to be unable to make life decisions, to take responsibility for his life, and caused plaintiff fear about taking care of himself. *See* Doc. #8-10 at 15.

But there are also competing records from social service and treatment providers that suggest that they did not see his diagnosed disability at the time he had filled out his ADLs — depression — as the root cause of his daily living problems; instead, they believed plaintiff to be "capable of working but does not want to." *See* Doc.# 8-7 at 104-05; *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 83 (2d Cir. 2015) (relying on the contemporaneous reports of medical providers that patient was "attention seeking" as substantial evidence to deny disability). Plaintiff was not diagnosed with dependent personality disorder at the time of those comments. While there is substantial evidence that plaintiff has a moderate difficulty with personal cleanliness and time management when living by himself, the evidence did not compel a finding that he had *marked* difficulty to the level that he "ha[d] serious difficulty performing

11

[daily activities] without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

There is even less evidence to support the existence of other "paragraph B" conditions. Multiple places in the record show that plaintiff had good social skills and was able to interact with others; there is no evidence that he had marked difficulty in social interaction. *See* Doc. #8-10 at 25. Plaintiff's treatment providers and the consulting physician rated him as having moderate concentration difficulties, and substantial evidence supports this conclusion. Finally, there is no evidence that plaintiff experienced any episodes of decompensation in the period leading up to the hearing. Substantial evidence supported the ALJ's conclusion that plaintiff did not have a "marked difficulty" in any two of the "paragraph B" criteria. Therefore, the ALJ did not err with respect to her finding as to step three of the disability evaluation process.

*4. Alleged Error of ALJ as to Step Four (Residual Functional Capacity)*

Plaintiff next challenges the ALJ's determination of his residual functional capacity. It is well-established that a calculation of RFC must be based on the medical record and not on the ALJ's lay opinion. *See Burgess*, 537 F.3d at 131. In calculating the RFC, "an ALJ is not required to discuss every piece of evidence submitted," and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal citation omitted). Further, a treating physician's opinion is not afforded controlling weight if that opinion is inconsistent with other substantial evidence in the record. *See Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004); *Abbott v. Colvin*, 596 F. App'x 21, 24 (2d Cir. 2015).

Plaintiff argues that the ALJ's RFC determination is not consistent with the medical evidence showing that plaintiff was not capable of moderately complex tasks. Indeed, the

administrative record in this case shows that Dr. Warren and Dr. Stack both noted that plaintiff was unable to perform moderately or highly complex or detailed tasks. *See* Doc. #8-4 at 9, 29. Dr. Rangel likewise noted that plaintiff could perform simple instructions, with some problems with focus, but could not perform more complex tasks. Doc. #8-9 at 40-41.[2]

The ALJ's ruling acknowledged this evidence. Doc. #8-3 at 45. Still, however, the ALJ elsewhere found that plaintiff can "understand, remember and carry out simple instructions" and also that he can "occasionally understand, remember, *and carry out moderately complex instructions*." Doc. #8-3 at 41-42 (emphasis added). This finding—that plaintiff could carry out complex instructions—is inconsistent with the medical opinions, because none of the medical opinions indicated that plaintiff could perform anything above a simple task.

Nevertheless, as the Commissioner points out, this error is ultimately harmless because—at step five of the evaluation process—the jobs that the vocational expert identified were all jobs that only required following, remembering, and carrying out simple instructions. Therefore, this aspect of error in the RFC determination did not affect the ultimate determination of disability in this case. *See, e.g., Akey v. Astrue*, 467 F. App'x 15, 17 (2d Cir. 2012) ("The ALJ's failure to include the limitation to unskilled and semi-skilled work is harmless because the only jobs the vocational expert identified were unskilled or semi-skilled.")

Plaintiff also contends that the ALJ's RFC assessment did not account for plaintiff's complaints of back pain. But there was substantial evidence in the record to support the ALJ's finding of no limitation because of back pain. The sole evidence of any medical treatment of back pain was plaintiff's complaints during his visit to the emergency room in August 2010 and

---

[2] Dr. Popescu's opinion was recorded before the ALJ's decision, but only entered the record after the ALJ's decision, and therefore is not considered here. Doc. #8-8 at 46 (medical record dated September 24, 2012 but faxed on November 19, 2012).

the resulting diagnosis of lumbar strain and sciatica. *See* Doc. #8-11 at 3. There are no records of ongoing treatment.

Plaintiff next contends that the ALJ's RFC evaluation did not appropriately account for his dependent personality disorder (DPD) diagnosis. While the ALJ's decision as a whole reflects the diagnosis of DPD, the ALJ's RFC evaluation appears to be based on the reports of medical consultants and plaintiff's own reports of ADLs that were made *before* plaintiff's May 2011 diagnosis of DPD. Because of this omission, plaintiff claims that the ALJ's finding that the plaintiff could work "throughout an ordinary workday and workweek with normal breaks on a sustained basis" is not supported by substantial evidence based on his diagnosed DPD, which assertedly prevents him from being able to make it to work on a regular and dependable basis. *See* Doc. #17-1 at 38-39.

In May 2011, the diagnosing doctor listed the following symptoms of dependent personality disorder: plaintiff's inability to "make decisions by himself," his refusal "to take responsibility for his life," and his "fear of not being able to take care of himself." Doc. #8-10 at 15.[3] It is not clear that the ALJ considered the dependent personality disorder diagnosis and symptoms in determining the RFC. Although an ALJ is not required to cite and detail all the records on which she relied in calculating the RFC, the Court is uncertain on the basis of the present record that ALJ fully accounted for the DPD diagnosis and whether that diagnosis may have altered the ALJ's assessment of plaintiff's RFC.

The ALJ concluded that plaintiff was not credible regarding the severity of his symptoms. The ALJ pointed to the disability determinations performed by the state medical consultants in

---

[3] The events that plaintiff cites in his brief as evidence of his dependent personality disorder—alienating therapists and social workers, ineffectively dealing with his housing crisis, inability to fill out forms—are not listed anywhere in the medical records as symptoms of dependent personality disorder. The medical record from the date of diagnosis indicates on the whole that plaintiff still presented with normal social function, showed up to the appointment dressed appropriately if with poor hygiene, and was pleasant.

November 2009 and August 2010 (Doc. #8-4) as the "evidence of record" that "the claimant experienced only mild to moderate symptoms and work-related limitations." Doc. #8-3 at 44. And the ALJ cited the inconsistency between plaintiff's self-described symptoms and the findings of the state medical consultants combined with the plaintiff's descriptions of his ADLs (which the ALJ found showed little restriction) as examples of his lack of credibility regarding his symptoms:

> [T]he claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Doc. #8-3 at 44. The ALJ also cited plaintiff's lack of evidence of disability for the entire claimed period, inconsistent statements regarding substance abuse, and the fact that his symptoms improved with counseling and medication—all as reasons why she did not find his description of the severity of symptoms to be credible.

Determining "credibility of witnesses, including the claimant" is "the function of the Secretary," not the Court. *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984); *see also Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 540 (S.D.N.Y. 2015). This Court reviews the ALJ's findings regarding credibility for clear error. *Aponte,* 728 F.2d at 591. If, however, an ALJ has not correctly assessed the medical evidence, then a mistaken assessment of the medical evidence should not form the basis for a finding that plaintiff is not credible. *See Rosa*, 168 F.3d at 82 ("Because we have concluded that the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding Rosa's credibility.").

The Court is concerned that the ALJ's adverse credibility finding was affected by an incomplete account of the medical record. The medical evidence cited by the ALJ for

discounting plaintiff's reported symptoms pre-dates plaintiff's DPD diagnosis in May 2011. *See* Doc. #8-3 at 43 (noting "[t]he evidence of record supports the finding that the claimant experienced only relatively mild to moderate symptoms and work-related limitations" citing exhibits 3A, 4A, 7A, and 8A which were disability determination explanations from 2009 and 2010). The state medical consultants did not have access to plaintiff's later diagnosis, and there was no new state medical consultant disability recommendation made following the DPD diagnosis of May 2011.

The symptoms described as part of the DPD diagnosis are consistent with the severity of symptoms that plaintiff described, and these symptoms may explain plaintiff's answers on the ADLs. For example, plaintiff's diagnosed inability to "make decisions by himself," his refusal "to take responsibility for his life," and his "fear of not being able to take care of himself," Doc. #8-10 at 15, is consistent with contemporaneous social services records and his ADLs that indicated an inability to get help from others, to feed himself adequate and nutritious food, and to arrive to appointments on time and with appropriate attire. *See* Doc. #8-7 at 91-94. Because substantial uncertainty remains about whether the ALJ fully considered plaintiff's DPD diagnosis when determining his RFC and credibility, the Court will remand the case for the ALJ to reconsider its determination as to step four of the disability evaluation process.[4]

*5. Alleged Error of ALJ as to Step Five (Employment Availability)*

Lastly, plaintiff contends that the ALJ erred at step five in finding—on the basis of testimony from the vocational expert—that there were other jobs existing in significant numbers

---

[4] If the ALJ's credibility determination could properly rest on plaintiff's diagnosis of depression alone—and not take his DPD diagnosis into account—then there would be no basis for concern about the ALJ's credibility assessment. The record is replete with references to plaintiff's non-disability based reasons for unemployment – his refusals to work at a job set up by his social service providers (Doc. #8-10-at 3) and his lack of desire to work in general (Doc. #8-7 at 110). His social services providers likewise questioned his inability to perform his own life tasks in February 2010, noting that he let "his 'illness' get in the way." Doc. #8-7 at 105. But this evidence was based solely on plaintiff's depression diagnosis and was created prior to plaintiff's diagnosis with DPD.

in the national economy that he could perform. Plaintiff contends that behavioral symptoms from his DPD diagnosis may result in unanticipated absences from work, and he points to testimony from the vocational expert that suggests that the expert's conclusions about available employment opportunities for plaintiff may have been different if it were assumed that plaintiff would have unanticipated absences of one day per month from work. Doc. #8-4 at 96-97. Because I am remanding for a re-determination of RFC under step four, I need not determine if plaintiff's argument has merit. On remand, however, the ALJ should also reconsider step five of the analysis to ensure that plaintiff's DPD diagnosis is fully considered with respect to whether jobs remain available for him in the economy.

## CONCLUSION

Plaintiff's motion to reverse the decision of the Commissioner (Doc. #17) is GRANTED. Defendant's motion to uphold the decision of the Commissioner (Doc. #19) is DENIED. The case is remanded for reconsideration and articulation of the effect of plaintiff's DPD diagnosis with respect to the ALJ's determination of his RFC at step four and with respect to the ALJ's determination of his employment possibilities at step five. Of course, the Court expresses no view concerning whether this additional evaluation should make any difference to the outcome of the ALJ's decision.

It is so ordered.

Dated at New Haven this 25th day of April 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge